IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>ESSA BANK & TRUST,<br><br>    Defendant. | CIVIL ACTION NO. 23-cv-2065<br><br>JURY DEMAND |

## **COMPLAINT**

1. The United States of America (the "United States") brings this action against ESSA Bank & Trust ("ESSA," the "Bank," or "Defendant") under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601–3619, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. §§ 1691–1691f, to remedy discrimination in ESSA's residential mortgage lending.

## INTRODUCTION

2. The FHA and ECOA prohibit banks and other creditors from discriminating against persons on the basis of race, color, national origin, or other characteristics when engaging in residential mortgage lending.

3. "Redlining" is one type of discrimination that is prohibited under the FHA and ECOA. Redlining occurs when, based on the race, color, or national origin of a neighborhood's residents, lenders discourage applications for home loans and other

credit services, deny equal access to home loans and other credit services, or avoid providing home loans and other credit services.

4.    From 2017 through at least 2021 (the "Relevant Period"), ESSA engaged in a pattern or practice of unlawful redlining in the Philadelphia-Camden-Wilmington, PA-NJ-DE-MD Metropolitan Statistical Area ("Philadelphia MSA"). Specifically, ESSA avoided providing home loans[1] and other mortgage services in majority-Black and Hispanic neighborhoods[2] in counties in the Philadelphia MSA that fell within the Bank's Lending Area.[3] ESSA also engaged in acts and practices directed at prospective applicants that would discourage prospective applicants from applying for credit in the Philadelphia MSA.

5.    The Bank operates four full-service branches in the Philadelphia MSA, and at least two of those branches are within miles of majority-Black and Hispanic neighborhoods in Philadelphia County. Despite the proximity of these branches to Philadelphia County, the Bank chose not to include any part of Philadelphia County in its Community Reinvestment Act ("CRA") assessment area.

---

[1] In this Complaint, the terms: (a) "home loans" and "mortgage loans" refer to all loans that ESSA and other creditors must report under the Home Mortgage Disclosure Act ("HMDA"), 12 U.S.C. §§ 2801–2810; and (b) "mortgage lending" refers to providing those loans.

[2] A "majority-Black and Hispanic" census tract ("MBHCT") is a residential census tract for which the United States Census Bureau has identified more than 50 percent of the residents as either "Black or African American" or "Hispanic or Latino." This Complaint uses "majority-Black and Hispanic census tract," "majority-Black and Hispanic area," and "majority-Black and Hispanic neighborhood" interchangeably and does the same for "majority-white census tract," "majority-white area," and "majority-white neighborhood."

[3] The Philadelphia MSA includes counties in Pennsylvania, New Jersey, Delaware, and Maryland. This Complaint is limited only to redlining in the Pennsylvania counties that are within the Bank's Lending Area, as defined in paragraph 32.

6.      As a depository bank, ESSA is subject to the requirements of the CRA, 12 U.S.C. §§ 2901-2908, and its enabling regulations, which require covered banks to meet the credit needs of the communities that they serve. Each bank subject to the CRA self-identifies the communities that it serves in the bank's "assessment areas." Federal regulators look at a bank's assessment area in evaluating whether an institution is meeting the credit needs of its entire community.

7.      By not including Philadelphia County, ESSA excluded a county with predominantly majority-Black and Hispanic census tracts from its CRA assessment area. According to the 2019 American Community Survey ("ACS"), over half of the census tracts in Philadelphia County are majority-Black and Hispanic census tracts.

8.      By contrast, the areas that ESSA chose to include in its assessment area are predominantly white. According to the 2019 ACS, over 87% of the census tracts included in the Bank's assessment area are majority-white.

9.      During the Relevant Period, ESSA failed to assign loan officers to staff adequately branches that served majority-Black and Hispanic neighborhoods in the Philadelphia MSA. ESSA also largely excluded majority-Black and Hispanic neighborhoods from its residential lending marketing and outreach efforts and adopted a policy that excluded residents of majority-Black and Hispanic neighborhoods in Philadelphia County from participating in a program designed to expand home ownership opportunities for low- and moderate-income households.

10.      Further, throughout the Relevant Period, ESSA was aware of its redlining risk through third-party reports that identified a lack of mortgage-lending activity in majority-Black and Hispanic areas and a lack of applications from Black and Hispanic borrowers. ESSA failed to address redlining risk identified in these reports.

11.     Through and as a result of these practices, ESSA discouraged applicants and prospective applicants from majority-Black and Hispanic neighborhoods in the Philadelphia MSA from applying for home loans and other mortgage-related services, and generated disproportionately low numbers of loan applications and home loans from those neighborhoods, as compared with similarly situated lenders.

12.     ESSA's conduct and practices were intended to deny, and had the effect of denying, equal access to home loans to majority-Black and Hispanic neighborhoods in the Philadelphia MSA, and otherwise discouraged residents of such communities from applying for mortgage loans on the basis of the race or national origin of the residents of those neighborhoods.

13.     ESSA's conduct and practices reinforced and perpetuated segregated housing patterns. The Bank's conduct was not justified by a legitimate, nondiscriminatory reason or business necessity and was not necessary to achieve a substantial, legitimate, nondiscriminatory interest.

## JURISDICTION AND VENUE

14.     The Court has subject-matter jurisdiction because this civil action: (a) arises under federal laws, 42 U.S.C. § 3614(a), 15 U.S.C. § 1691e(h); (b) presents a federal question, 28 U.S.C. § 1331; and (c) is brought by the United States, 28 U.S.C. § 1345.

15.     Venue is proper under 28 U.S.C. § 1391 because a substantial part of the events and omissions giving rise to the United States' claims occurred in this judicial District.

**PARTIES**

16.    The United States brings this action to enforce provisions of the FHA and ECOA.

17.    The FHA and ECOA authorize the United States Attorney General to bring a civil action in federal district court whenever the Attorney General has reason to believe that an entity is engaged in a pattern or practice of impeding the full enjoyment of rights secured by the FHA and ECOA. 42 U.S.C. § 3614(a); 15 U.S.C. § 1691e(h). The FHA further authorizes the Attorney General to sue when a defendant has denied rights to a group of persons in a manner that raises an issue of general public importance. 42 U.S.C. § 3614(a).

18.    ESSA is a state-chartered community savings bank headquartered in Stroudsburg, Pennsylvania that offers lending, depository, and related financial services throughout Pennsylvania. As of December 31, 2021, the Bank's assets totaled $1.9 billion.

19.    ESSA currently operates 21 full-service branches in Pennsylvania, including four branches located within the Philadelphia MSA. The Bank's four branches within the Philadelphia MSA are located at: (a) 8045 West Chester Pike, Upper Darby, Pennsylvania, 19082 (the "Upper Darby Branch"); (b) 48 West Marshall Road, Lansdowne, Pennsylvania 19050 (the "Lansdowne Branch"); (c) 227 West Lancaster Avenue, Devon, Pennsylvania 19333 (the "Devon Branch"); and (d) 354 West Lancaster Avenue, Haverford, PA 19041 (the "Haverford Branch"). The Upper Darby Branch and Lansdowne Branch are located in Delaware County, Pennsylvania. The Devon Branch is located in Chester County, Pennsylvania, and the Haverford Branch is

located in Montgomery County, Pennsylvania. *See* **Exhibit A** (depicting ESSA's branches in the Philadelphia MSA from 2017 to 2021).

20.    ESSA is subject to the regulatory authority of the Federal Deposit Insurance Corporation (the "FDIC").

21.    ESSA is subject to the FHA, ECOA, and their respective implementing regulations, 24 C.F.R. pt. 100 and Regulation B.

22.    ESSA is a "creditor" within the meaning of ECOA, 15 U.S.C. § 1691a(e), and is engaged in "residential real estate-related transactions" under the FHA, 42 U.S.C. § 3605.

## FACTUAL ALLEGATIONS

### A.  The Philadelphia MSA and ESSA's Assessment Area

23.    The Philadelphia MSA includes five Pennsylvania counties: Bucks, Chester, Delaware, Montgomery, and Philadelphia. The city of Philadelphia, which is the most populous city in the MSA, is located in Philadelphia County.

24.    According to 2020 United States Census data, the total population of the Philadelphia MSA was approximately 6.2 million. 59% of the MSA's residents identified themselves as white; 10% as Hispanic or Latino; 20% Black; and 7% Asian.[4]

25.    Philadelphia County is the most populous county in the Philadelphia MSA. In Philadelphia County alone, the total population in 2020 was 1.6 million. 34% of the county's residents identified themselves as white; 15% as Hispanic or Latino; 38% Black; and 8% Asian.

---

[4] As defined by the U.S. Census Bureau, the category "Hispanic or Latino" includes respondents who identify as Hispanic or Latino of any race.

26.     During the Relevant Period, ESSA's CRA assessment area included all of Delaware, Lackawanna, Lehigh, Monroe, Montgomery, and Northampton Counties in Pennsylvania, as well as portions of Luzerne and Chester Counties in Pennsylvania.

27.     ESSA did not include any portion of Philadelphia County in its self-defined CRA assessment area.

28.     The Bank has three branches in counties that border Philadelphia County, and two of those branches—the Upper Darby and Lansdowne Branches—are within miles of Philadelphia County.

29.     The Bank acquired all four of its branches in the Philadelphia MSA in December 2015, when it acquired Eagle National Bank. Before the acquisition, Eagle National Bank included all of Philadelphia County in its CRA assessment area.

30.     By excluding Philadelphia County from its assessment area, the Bank excluded a significant number of majority-Black and Hispanic census tracts in West Philadelphia that are located just across the Delaware County/Philadelphia County border and that are within miles of the Bank's Upper Darby and Lansdowne Branches. *See* **Exhibits B & C** (depicting majority-Black and Hispanic census tracts within a 3-, 5-, and 7-mile radius of the Bank's Upper Darby and Lansdowne Branches).

**B. FDIC's Consumer Compliance Examination and Referral to DOJ**

31.     During a July 6, 2021 consumer compliance examination, the FDIC concluded that there was reason to believe that, by redlining in the Philadelphia MSA, ESSA had engaged in a pattern or practice of illegal credit discrimination on the prohibited basis of race in violation of the FHA, 42 U.S.C. § 3605(a), and ECOA, 15 U.S.C. § 1691(a) and Regulation B, 12 C.F.R. § 1002.4(a).

32.     In conducting its examination and reaching its conclusions, the FDIC determined that ESSA actually marketed or provided credit and/or could reasonably be expected to have marketed and provided credit beyond the Bank's self-defined CRA assessment area. Specifically, the FDIC concluded that the bank actually marketed or provided credit and/or could reasonably be expected to have marketed and provided credit to all of Carbon, Chester, Delaware, Lackawanna, Lehigh, Luzerne, Monroe, Montgomery, Northampton and Philadelphia Counties in Pennsylvania. These counties are collectively referred to herein as the Bank's "Lending Area."

33.     On June 6, 2022, the FDIC referred the matter to the United States Attorney General pursuant to 15 U.S.C. § 1691e(g).

34.     On August 15, 2022, the U.S. Department of Justice informed ESSA that it had initiated an investigation into potential lending discrimination by the Bank, including whether ESSA had discriminated on the basis of race and national origin when providing residential mortgage to majority-Black and Hispanic communities in the Philadelphia MSA.

### C.  ESSA Failed to Adequately Staff Branches that Served Majority-Black and Hispanic Neighborhoods

35.     During the Relevant Period, ESSA failed to hire or assign enough loan officers to serve the Bank's four branches in the Philadelphia MSA. The four branches in the Philadelphia MSA—Devon, Haverford, Lansdowne, and Upper Darby—are the branches that are nearest to the majority-Black and Hispanic census tracts located in Philadelphia, Delaware, Montgomery, and Chester Counties.

36.     After acquiring the Devon, Haverford, Lansdowne, and Upper Darby Branches (collectively the "Philadelphia Branches") from Eagle National Bank in

December 2015, ESSA initially assigned two mortgage loan officers to cover the four Philadelphia Branches. One of those officers left the Bank in June 2017, leaving only one assigned officer to the Philadelphia Branches.

37.    When the last mortgage loan officer assigned to cover the Philadelphia Branches left ESSA in November 2018, the Bank reassigned all four of the Philadelphia Branches to a mortgage loan officer based in Allentown, Pennsylvania, who was also assigned to cover ESSA's Allentown, Alburtis, and New Tripoli branches.

38.    From November 2018 to July 2021, a single loan officer based in Allentown was responsible for originating home loans for all seven branches—the four Philadelphia Branches, as well as the Bank's branches in Allentown, Alburtis and New Tripoli. By comparison, all other ESSA mortgage loan officers during this period were responsible for no more than four branches.

39.    During the Relevant Period, ESSA also did not hire or employ any non-white or bilingual loan officers.

40.    By failing to adequately staff branches that served majority-Black and Hispanic neighborhoods, ESSA discouraged residents of, or those seeking credit for properties located in, those neighborhoods from applying for and obtaining home loans and restricted their access to the Bank's credit and mortgage lending services.

### D.  ESSA's Marketing and Outreach Largely Excluded Residents of Majority-Black and Hispanic Census Tracts

41.    During the Relevant Period, ESSA engaged in limited marketing and outreach in the Philadelphia MSA and failed to advertise meaningfully in majority-Black and Hispanic neighborhoods.

42.    Although ESSA conducted multiple residential lending advertising campaigns in its CRA assessment area during the Relevant Period, none targeted majority-Black and Hispanic neighborhoods to compensate for its understaffed branches, and there was no residential lending advertising in Philadelphia County. This contributed to the low levels of applications from, and lending in, majority-Black and Hispanic neighborhoods in the Philadelphia MSA.

43.    During the Relevant Period, ESSA did conduct some small business lending marketing in Philadelphia County and originated more commercial loans in Philadelphia County than in other counties in the Bank's CRA assessment area. However, the Bank's small business lending marketing campaign excluded zip codes in Philadelphia County with high-Black and Hispanic populations.[5] ESSA did not advertise its small business lending in any zip code in the western portion of Philadelphia County, an area which is just a few minutes' drive away from the Bank's Lansdowne and Upper Darby Branches and contains a significant number of majority-Black and Hispanic census tracts.

44.    ESSA's marketing strategy during the Relevant Period reveals that the Bank intentionally targeted majority-white areas in the Philadelphia MSA, while excluding majority-Black and Hispanic areas. For example, in March 2021 the Bank launched a home equity line of credit ("HELOC") ad campaign that was explicitly intended to target the majority-white enclave of suburban Philadelphia known as the "Main Line."

---

[5] As used herein, the term "high-Black and Hispanic" refers to areas where over eighty percent of residents are Black or Hispanic.

45.     The "Main Line" is an informally delineated region of suburban Philadelphia, Pennsylvania that runs northwest from Center City parallel to Lancaster Avenue, also known as U.S. Route 30. The neighborhoods that comprise the "Main Line" are located in Montgomery and Chester counties and certain northern parts of Delaware County.

46.     During the Relevant Period, ESSA advertised its credit services in media outlets that primarily targeted majority-white census tracts in the Main Line and other wealthy Philadelphia suburbs. These chosen media outlets included *The Main Line Times* ("Serving the Main Line from Bala Cynwyd to Malvern") and *Suburban Life Magazine* ("Premiere Lifestyle Magazine in the Philadelphia Region").

47.     On its website, ESSA emphasized its desire to serve only suburban areas of Philadelphia, noting that the Bank operates "offices throughout Pennsylvania in the Greater Pocono, Lehigh Valley, Scranton/Wilkes-Barre and suburban Philadelphia markets." (Emphasis added).

**E.  ESSA's Lending Policies Discriminated Against Majority-Black and Hispanic Tracts in Philadelphia County**

48.     ESSA's residential lending policies discriminated against the residents of majority-Black and Hispanic neighborhoods in Philadelphia County.

49.     During the Relevant Period, ESSA offered a Community Home Buyer Program ("CHBP") for eligible 1-4 family residential properties within the Bank's CRA assessment area.

50.     The CHBP was designed to expand home ownership opportunities for low- and moderate-income households, by providing: (a) rate guarantees for 60 days from application; (b) discounted interest rates and closing costs; (c) low down-

payment requirements; (d) appraisal fee refunds; (e) reductions in mortgage insurance premiums; and (f) related educational programs.

51.    As eligibility for the CHBP was limited to properties in ESSA's CRA assessment area, the Bank's policy effectively excluded the residents of majority-Black and Hispanic census tracts in Philadelphia County from participating in the program. As a result, a significant number of majority-Black and Hispanic neighborhoods in Philadelphia County within miles of the Bank's Lansdowne and Upper Darby Branches were excluded from participating in this program.

### F.  ESSA Had Notice of Redlining Risk for Years and Failed to Address the Risk

52.    During the Relevant Period, ESSA was aware that its operations were creating redlining risk.

53.    For calendar years 2017, 2018, 2019 and 2020, ESSA engaged a third-party vendor to assess and report on its fair lending performance.

54.    In each report for each of those years, the third-party risk assessment concluded that ESSA's application and origination volumes in "majority-minority" and "high-minority"[6] census tracts were low relative to the overall demographics of its assessment area.

55.    In each report for each of those years, the third-party risk assessment concluded that ESSA's application and origination volumes in "majority-minority" and "high-minority" census tracts were low relative to the Bank's peers.

---

[6] "Majority-minority" is a term of art generally used in the redlining context to refer to census tracts where the majority (over fifty percent) of residents are people of color. "High-minority" refers to census tracts where over eighty percent of residents are people of color.

56.     Despite being on notice of its redlining risk for years, ESSA failed to take action in response to these reports indicating that it was underserving communities of color. Specifically, ESSA did not conduct any outreach or advertising targeting majority-Black and Hispanic census tracts during the Relevant Period, nor did it take steps to increase the number of loan officers assigned to serve majority-Black and Hispanic census tracts in the Philadelphia MSA.

### G.  ESSA's Actions Led to Disproportionately Low Home Loan Applications from Majority-Black and Hispanic Neighborhoods

57.     ESSA's actions, lending policies, and practices, as alleged herein, have discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods in the Bank's Lending Area from applying for home loans and other mortgage-related services.

58.     ESSA's publicly available HMDA data on its loan applications and originations confirm that ESSA avoided serving majority-Black and Hispanic neighborhoods in the Bank's Lending Area. *See* **Exhibit D** (depicting ESSA's applications from majority-Black and Hispanic census tracts in its Lending Area from 2017 to 2021).

59.     During the Relevant Period, ESSA significantly underperformed its "peer lenders" in generating home loan applications[7] from majority-Black and Hispanic census tracts in the Bank's Lending Area. "Peer lenders" are similarly situated depository and non-depository financial institutions that received between 50 percent and 200 percent of the Bank's annual volume of home loan applications.

---

[7] In this section, the terms "home loan applications," "mortgage loan applications," and "HMDA applications" are used interchangeably to refer to mortgage loan applications for 1-4 family, owner-occupied properties.

60.     The disparity between the rate of applications generated by ESSA and the rate generated by its peer lenders from majority-Black and Hispanic areas within ESSA's Lending Area is both statistically significant—meaning unlikely to be caused by chance—and sizable in every year included in the Relevant Period.

61.     During the Relevant Period, ESSA received 4,128 HMDA-reportable mortgage loan applications within the Bank's Lending Area. Of these applications, only 72, or 1.7 percent, came from majority-Black and Hispanic census tracts.

62.     By contrast, over the same time period, ESSA's peers generated 14.4 percent of their HMDA applications from majority-Black and Hispanic census tracts in ESSA's Lending Area.

63.     In other words, ESSA's peers generated applications from majority-Black and Hispanic census tracts in ESSA's Lending Area at over eight times the rate of ESSA. When disparities were calculated for individual years, ESSA's peers generated applications at a rate between 5.2 to 14.3 times higher than ESSA in the Bank's Lending Area.

64.     The disparity between the rate of applications generated by ESSA and the rate generated by its peer lenders persists even when the analysis is limited to the Bank's self-defined CRA assessment area—an analysis that would exclude all of Philadelphia County.

65.     During the Relevant Period, ESSA received 3,966 HMDA-reportable mortgage loan applications within the Bank's assessment area. Of these applications, only 63, or 1.6 percent, came from majority-Black and Hispanic census tracts.

66.    By contrast, over the same time period, ESSA's peers generated 7 percent of their HMDA applications from majority-Black and Hispanic census tracts in ESSA's assessment area.

67.    In other words, ESSA's peers generated applications from majority-Black and Hispanic census tracts in ESSA's assessment area at over four times the rate of ESSA. When disparities were calculated for individual years, ESSA's peers generated applications at a rate between 2.5 and 7.8 times higher than ESSA in the Bank's assessment area.

68.    The statistically significant disparities between applications ESSA generated from majority-Black and Hispanic census tracts and those that its peers generated show that there was a substantial number of residents in majority-Black and Hispanic neighborhoods in both ESSA's Lending Area and CRA assessment area who were seeking and applying for home loans. ESSA had no legitimate, non-discriminatory reason to draw so few applications from these areas.

69.    These figures demonstrate a statistically significant failure by ESSA, relative to its peer lenders, to draw home loan applications from and provide residential mortgage services to residents of, and to those seeking credit for properties located in, majority-Black and Hispanic census tracts in both the Bank's Lending Area and the Bank's CRA assessment area on a non-discriminatory basis during the Relevant Period.

### H. ESSA's Actions Led to Disproportionately Low Home Loan Originations from Majority-Black and Hispanic Neighborhoods in the Lending Area

70.    In addition to discouraging applicants and prospective applicants from applying for home loans, ESSA's acts and lending policies and practices, as alleged

herein, also discouraged applicants and prospective applicants in majority-Black and Hispanic neighborhoods from obtaining home loans and other mortgage-related services. As a result, the Bank made a smaller percentage of HMDA-reportable residential mortgage loans in these neighborhoods compared to its peers from 2017 through 2021. *See* **Exhibit E** (depicting ESSA's loan originations from majority-Black and Hispanic census tracts in its Lending Area from 2017 to 2021).

71.     During the Relevant Period, ESSA made 2,990 HMDA-reportable residential mortgage loans in the Lending Area. Of those loans, only 42, or 1.4 percent, were made in majority-Black and Hispanic census tracts. By contrast, during the Relevant Period, ESSA's peers made 11.7 percent of their total HMDA-reportable residential mortgage loans in the same area to majority-Black and Hispanic census tracts in the Lending Area—more than eight times the rate of ESSA.

72.     When disparities were calculated for individual years, ESSA's peers made loans at a rate between 5.1 and 10.6 times the rate of ESSA within the Lending Area. The disparities are statistically significant for each individual year included in the Relevant Period.

73.     The disparity between the rate of home loans generated by ESSA and the rate generated by its peer lenders persists even when the analysis is limited to the Bank's self-defined CRA assessment area.

74.     During the Relevant Period, ESSA made 2,889 HMDA-reportable residential mortgage loans in the Bank's assessment area. Of those loans, only 36, or 1.2 percent, were made in majority-Black and Hispanic census tracts. By contrast, during Relevant Period, ESSA's peers made 5.7 percent of their total HMDA-reportable

residential mortgage loans in the assessment area to residents of majority-Black and Hispanic census tracts in the assessment area—nearly five times the rate of ESSA.

75.    When disparities were calculated for individual years, ESSA's peers made loans at a rate between 2.4 to 8.5 times the rate of ESSA within the assessment area. The disparities are statistically significant for each individual year included in the Relevant Period.

76.    The statistically significant disparities between the number of home loans ESSA made in majority-Black and Hispanic neighborhoods and those that its peers made demonstrate that ESSA's low rate of lending in majority-Black and Hispanic areas in the Lending Area and CRA assessment area cannot be attributed to a lack of individuals seeking credit for properties located in those areas. ESSA had no legitimate, non-discriminatory reason to make so few home loans from these areas.

77.    These figures show a statistically significant failure by ESSA, relative to its peer lenders, to make home loans and provide residential mortgage services to qualified applicants in majority-Black and Hispanic census tracts, both in its Lending Area and in its CRA assessment area, on a nondiscriminatory basis during the Relevant Period.

78.    ESSA's discriminatory practices as described herein were intended to discriminate and have had the effect of discriminating on the basis of race and national origin.

## CLAIMS FOR RELIEF

### COUNT I – VIOLATIONS OF THE FAIR HOUSING ACT

79.    The United States incorporates as if fully stated here all of the preceding paragraphs of this Complaint.

80.     ESSA's policies and practices constitute unlawful redlining of majority-Black and Hispanic communities in the Bank's Lending Area and CRA assessment area on account of the racial or national origin composition of those communities.

81.     As alleged in this Complaint, ESSA's conduct constitutes:

    a.     Discrimination on the basis of race and national origin in making available residential real estate-related transactions, or in the terms or conditions of residential real estate-related transactions, in violation of the Fair Housing Act, 42 U.S.C. § 3605(a), and its implementing regulations, 24 C.F.R. §§ 100.110(b), 100.120;

    b.     The making unavailable or denial of dwellings to persons because of race and national origin, in violation of the Fair Housing Act, 42 U.S.C. § 3604(a), and its implementing regulations, 24 C.F.R. § 100.50(b)(3); and

    c.     Discrimination on the basis of race and national origin in the terms, conditions, or privileges of the sale or rental of dwellings, or the provision of services or facilities in connection with the sale or rental of dwellings, in violation of the Fair Housing Act, 42 U.S.C. § 3604(b), and its implementing regulations, 24 C.F.R. §§ 100.50(b)(2), 100.65.

82.     As alleged in this Complaint, ESSA's policies and practices constitute:

    a.     A pattern or practice of resistance to the full enjoyment of rights secured by the Fair Housing Act; and

b. A denial of rights granted by the Fair Housing Act to a group of persons that raises an issue of general public importance within the meaning of 42 U.S.C. § 3614(a).

83. ESSA's pattern or practice of discrimination was intentional, willful, and implemented with reckless disregard for the rights of individuals based on their race and national origin.

84. Persons who have been victims of ESSA's discriminatory policies and practices are "aggrieved" as defined in 42 U.S.C. § 3602(i) and may have suffered damages as a result of the Bank's conduct in violation of the Fair Housing Act, as described above.

## COUNT II - VIOLATIONS OF THE EQUAL CREDIT OPPORTUNITY ACT

85. The United States incorporates as if fully stated here all of the preceding paragraphs of this Complaint.

86. As alleged in this Complaint, ESSA's conduct, policies, and practices constitute unlawful discrimination against applicants and prospective applicants, including through the Bank's: (a) redlining of majority-Black and Hispanic neighborhoods in the Bank's Lending Area and CRA assessment area; and (b) discouraging of prospective applicants in majority-Black and Hispanic communities from applying for credit, on the basis of race or national origin, all in violation of the Equal Credit Opportunity Act and Regulation B. 15 U.S.C. § 1691 *et seq*.; 12 C.F.R. § 1002.4(a)-(b).

87. As alleged in this Complaint, ESSA's policies and practices constitute a pattern or practice of discrimination and discouragement and resistance to the full

enjoyment of rights secured by the Equal Credit Opportunity Act, in violation of the Act. 15 U.S.C. § 1691e(h).

88.    ESSA's pattern or practice of discrimination was intentional, willful, and implemented with reckless disregard for the rights of individuals based on their race and national origin.

89.    Persons who have been victims of ESSA's discriminatory policies and practices are "aggrieved" as defined in 15 U.S.C. §1691e(i) and may have suffered damages as a result of the Bank's conduct in violation of the Equal Credit Opportunity Act, as described above.

## **REQUEST FOR RELIEF**

WHEREFORE, the United States respectfully requests the Court to enter an order and judgment for the United States and against ESSA, and specifically to enter an Order:

(1) Declaring that ESSA's conduct violates the Fair Housing Act;

(2) Declaring that ESSA's conduct violates the Equal Credit Opportunity Act;

(3) Enjoining ESSA, its officers, agents, servants, employees, assignees, and successors in interest, and all other persons in active concert or participation with ESSA, from:

    A.    Discriminating on account of race or national origin in any aspect of their lending business practices;

    B.    Discouraging applicants on account of race or national origin;

    C.    Failing or refusing to take such affirmative steps as may be necessary to restore, as nearly as practicable, the victims of ESSA's unlawful

practices to the positions they would be in but for the discriminatory conduct;

D.    Failing or refusing to take such affirmative steps as may be necessary to prevent the recurrence of any discriminatory conduct in the future and to eliminate, to the extent practicable, the effects of ESSA's unlawful practices, and providing policies and procedures to ensure that all segments of ESSA's market area are served without regard to prohibited characteristics;

(4) Awarding monetary damages against ESSA in accordance with 42 U.S.C. § 3614(d)(1)(B) and 15 U.S.C. §§ 1691(a)(9), 1691e(h);

(5) Assessing a civil penalty against ESSA in an amount authorized by 42 U.S.C. § 3614(d)(1)(C), in order to vindicate the public interest; and

(6) Awarding the United States such further relief as the interests of justice may require.

## DEMAND FOR JURY TRIAL

Under Federal Rule of Civil Procedure 38, the United States demands a jury trial on all issues so triable.

Dated: May 31, 2023                              Respectfully submitted,

                                                 MERRICK B. GARLAND
                                                 Attorney General

/s/ Jacqueline C. Romero
JACQUELINE C. ROMERO                             KRISTEN CLARKE
United States Attorney                           Assistant Attorney General
Eastern District of Pennsylvania                 Civil Rights Division


/s/ Gregory B. David
GREGORY B. DAVID                                 SAMEENA SHINA MAJEED
Assistant United States Attorney                 Chief
Chief, Civil Division                            VARDA HUSSAIN
CHARLENE KELLER FULLMER                          Special Litigation Counsel for Fair
Assistant United States Attorney                 Lending
Deputy Chief, Affirmative Litigation


/s/ Gerald B. Sullivan                           /s/ Audrey M. Yap
GERALD B. SULLIVAN                               AUDREY M. YAP
Assistant United States Attorney                 Trial Attorney
United States Attorney's Office                  Housing and Civil Enforcement Section
Eastern District of Pennsylvania                 Civil Rights Division
615 Chestnut Street, Suite 1250                  U.S. Department of Justice
Philadelphia, PA 19106-4476                      950 Pennsylvania Avenue NW
Phone: (215) 861-8786                            Washington, DC 20530
Gerald.Sullivan@usdoj.gov                        Telephone: (202) 514-4713
                                                 Audrey.Yap@usdoj.gov


*Attorneys for United States of America*